

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

KEVIN MAHER, on behalf of himself
and all others similarly situated,

                       Plaintiff,

    --*against*--

BANK OF NOVA SCOTIA, BARCLAYS BANK
PLC, DEUTSCHE BANK, AG, HSBC HOLDINGS
PLC, SOCIÉTÉ GÉNÉRALE, and
JOHN DOES 1-50,

                    Defendants.

_____

No. _____

**JURY TRIAL DEMANDED**

### CLASS ACTION COMPLAINT

Plaintiff complains of Defendants (*see* ¶¶27-33) on information and belief,[1]

except as to ¶26, as follows:

_____

[1] Plaintiff's information is based on records of prices of gold, gold futures contracts, and other gold derivatives; articles and public news reports including reports that Defendant Deutsche Bank (as defined in ¶29) is withdrawing from the Gold Fix (as defined in ¶2); reports that the Gold Fix is revising or studying revising its rules; and reports of studies by academics, consultants and/or market participants concluding that collusion or manipulation of the Gold Fix is a likely explanation for aberrant pricing patterns observed in connection with the Gold Fix. *E.g.*, Liam Vaughan, *Gold Fix Study Shows Signs of Decade of Bank Manipulation*, BLOOMBERG, Feb. 28, 2014, http://www.bloomberg.com/news/2014-02-28/gold-fix-study-shows-signs-of-decade-of-bank-manipulation.html; Madison Marriage, *Gold Price Rigging Fears Put Investors On Alert*, FINANCIAL TIMES, Feb. 23, 2014, http://webcache.googleusercontent.com/search?q=cache%3Ahttp%3A%2F%2Fww

## SUMMARY OF ALLEGATIONS

1.  **Unlawful conduct.**  Plaintiff has good grounds to believe and does allege that at times between approximately January 1, 2004 and the present ("Class Period"), Defendants (as defined in ¶¶27-33 below) combined, conspired and agreed with one another and persons unknown to Plaintiff, in order to manipulate prices of gold and gold derivatives contracts.

2.  **Means and Purpose.**  Defendants have effected their foregoing manipulation in order to profit themselves individually and collectively.  This includes by abusing Defendants' ownership of, and positions as Fixing Members of, The London Gold Market Fixing Ltd. ("Gold Fix").

3.  As such members, Defendants reportedly engage in a process twice a day which results in the reported morning Gold Fix and the reported afternoon Gold Fix.

4.  The reports of the Gold Fix are the most important of the daily reports that influence the prices of gold.  Gold derivatives, including the price of COMEX gold futures contracts traded in this District on the COMEX, a Designated Contract

---

w.ft.com%2Fintl%2Fcms%2Fs%2F0%2Fd5e00172-9b14-11e3-946b-00144feab7de.html#axzz2ueMayt6R.
 Plaintiff's information is also based upon investigation by counsel of the activities by Defendants.

Market of the Chicago Mercantile Exchange Group Inc., are strongly influenced by the Gold Fix.

5.      Recent published and unpublished statistical studies, papers or analyses indicate that gold prices have been manipulated by and during and around the times of the Gold Fix.

6.      For example, one such analysis indicates that, since 2004, the time during the daily afternoon Gold Fix has exhibited a statistically significant pattern that includes the following.

7.      **First**, unusually large spikes in spot gold prices have consistently occurred during the afternoon Gold Fix.

8.      This statistical pattern was not observed prior to 2004, when Rothschild withdrew from the Gold Fix and Barclays took over as Chairman.  *See* ¶¶ 18-19, *infra*. Such pattern is not explained by news flow, fundamental analysis, or *a priori* explanations of how an efficient market operates.

9.      **Second**, there has been a propensity of the unusually large spikes during the afternoon in gold prices to exhibit a downward movement in gold prices.  During 2010, for example, when Plaintiff was long COMEX gold futures contracts, these aberrantly large movements were decreases in the price of gold 92% of the time such spikes were observed.

3

10.     This statistical pattern also is not explained by news flow, fundamental factors nor by *a priori* expectations of how an efficient market operates.  On the contrary, such consistent large moves and statistical pattern are explained best by a collusive manipulation of prices in and around the times of the Gold Fix.

11.     Significant moves in gold prices registered around the time of the Gold Fix have also occurred on days of expiration of options on the COMEX gold futures contracts in this District.

12.     As reports of potential gold price manipulation have surfaced, Defendants have changed their conduct in numerous ways.

13.     **First**, at least one Defendant has publicly announced that it will withdraw from the Gold Fix.  That Defendant is Defendant Deutsche Bank. Specifically, in mid-January 2014, Defendant Deutsche Bank said that it will withdraw from the gold panel, but that it will continue in its role until a buyer is found for the seat. *See, e.g.,* http://online.wsj.com/news/articles/SB10001424052702304603704579326202725 433242?mg=reno64-wsj&url=http%3A%2F%2Fonline.wsj.com%2Farticle%2FSB10001424052702304 603704579326202725433242.html.

14.    When asked to comment on whether the bank's withdrawal from the panels was related to the recent regulatory scrutiny on the benchmark-setting process, "Deutsche Bank declined to comment." *Id.*  The other four panel members likewise declined to comment on Deutsche Bank's motive for withdrawing.  None of them denied the existence of manipulation.  *Id.*

15.    **Second**, Defendants, who collectively comprise the London Gold Fix panel, have begun investigating changes in the way the Gold Fix operates. *See, e.g.,* http://www.bloomberg.com/news/2014-01-21/century-old-london-gold-fix-said-to-face-overhaul-amid-scrutiny.html. Defendants "have formed a steering committee that's seeking external firms to advise how the process could be improved . . . ." *Id.*

16.    **Third**, at least one or more Defendants has met with, responded to inquiries from, and turned over documents to regulators in Germany and the United Kingdom.  *See, e.g.,* http://www.ft.com/intl/cms/s/0/b386aa16-6358-11e3-886f-00144feabdc0.html#axzz2ueeLXjkG.

17.    Reportedly, Germany's financial regulator, BaFin, "demanded documents from Deutsche Bank as part of an investigation into potential manipulation of gold and silver prices." *Id.* ("BaFin confirmed that it had been looking into the possible manipulation of gold and silver prices . . . but declined to

comment on specific institutions"). The Financial Conduct Authority, a private

financial service regulator in the U.K., is also "scrutinizing how prices are set in

the $20 trillion gold market." *See, e.g.,* http://www.bloomberg.com/news/2013-11-

26/gold-fix-drawing-scrutiny-amid-knowledge-tied-to-eruption.html.

18.     Defendants have been the subject of other charges or reports that they

helped manipulate prices including of LIBOR as to all Defendants, and as to

Euribor and TIBOR as to all Defendants but Defendant Nova Scotia. In

connection with LIBOR, various banks at first denied reports of manipulation.

19.     (a) There was at least some government supervision or regulation of

Defendants in place with respect to LIBOR, TIBOR, and Euribor. However, there

was no government supervision and regulation in place for the Gold Fix.

(b) Thus, **fourth**, however, when given the opportunity to deny any

wrongdoing here, Defendants have instead elected not to issue any comment. *See,*

*e.g.,* http://www.bloomberg.com/news/2014-01-21/century-old-london-gold-fix-

said-to-face-overhaul-amid-scrutiny.html.

20.     As a direct result of Defendants' unlawful conduct alleged herein,

Plaintiff and the Class transacted in an artificial market and were or are presumed

to have been injured and damaged thereby.

6

## JURISDICTION AND VENUE

21.     Gold is a "commodity" and is the "commodity underlying" gold futures and options contracts traded on the COMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

22.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Section 22 of the CEA, 7 U.S.C. § 25.

23.     This Court has jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, Section 22 of the CEA, 7 U.S.C. 25, and 28 U.S.C. §§ 1331 and 1337.

24.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), pursuant to Section 22 of the CEA, 7 U.S.C. § 25, and 28 U.S.C. § 1391(b), (c) and (d).  The Defendants transacted business in the Southern District of New York, the Plaintiff suffered losses in the Southern District of New York.  Defendants' unlawful acts allegedly manipulated the prices of COMEX gold (sometimes, "gold") futures contracts which were traded in this District in which COMEX is located, at One North End Avenue, New York, New York.

25.     Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

### Plaintiff

26.     Plaintiff Kevin Maher is a resident of New York State.  Plaintiff purchased and sold COMEX gold futures and options, as well as physical gold, during the Class Period.  Plaintiff allegedly transacted at artificial prices or in an artificial market due to Defendants' manipulation.

### Defendants

27.     Defendant Bank of Nova Scotia ("BNS"), doing business as Scotiabank ("Scotiabank"), is a Canadian public company headquartered in Toronto, Canada.  Defendant Scotiabank is licensed by the New York Department of Financial Services with a registered address at One Liberty Plaza, 22nd-26th Floors, New York, NY 10006.  Defendant, through their broker-dealer affiliate, The Bank of Nova Scotia, actively traded COMEX gold futures contracts during the Class Period.

28.     Defendant Barclays Bank plc ("Barclays") is a British public limited company headquartered at 1 Churchill Place, London E14 5HP, England.  Barclays is licensed by the New York Department of Financial Services with a registered address at 745 Seventh Avenue, New York, NY 10019, and a foreign representative office at One MetLife Plaza, 27-01 Queens Plaza North, Long Island City, New York 11101. Defendant, through their broker-dealer affiliate, Barclays Capital Inc., actively traded COMEX gold futures contracts during the Class Period.

29.     Defendant Deutsche Bank, AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.  Deutsche Bank is licensed by the New York Department of Financial Services with a registered address at 60 Wall Street, New York, NY 10005. Defendant, through their broker-dealer affiliate, Deutsche Bank Securities Inc., actively traded COMEX gold futures contracts during the Class Period.

30.     Defendant HSBC Holdings plc is a British public limited company headquartered in London at 8 Canada Square, London E14 5HQ, England. Defendant HSBC Bank U.S.A., N.A., is the principal subsidiary of HSBC U.S.A. Inc., an indirect, wholly-owned subsidiary of HSBC North America Holdings Inc. HSBC Holdings and HSBC Bank U.S.A., Inc. are collectively referred to herein as

9

"HSBC."    Defendant, through their broker-dealer affiliate, HSBC Securities (USA) Inc., actively traded COMEX gold futures contracts during the Class Period.

31.    Defendant Société Générale ("SocGen") is a public banking and financial services company headquartered in Paris, France.  Defendant SocGen is licensed by the New York Department of Financial Services with a registered address at 1221 Avenue of the Americas, New York, NY 10020. Defendant, through their broker-dealer affiliate, held by virtue of a joint-venture, Newedge USA, LLC, which was formed by Société Générale and Crédit Agricole CIB, as a 50/50 joint venture, actively traded COMEX gold futures contracts during the Class Period.

32.    During the Class Period, Defendants BNS, Barclays, Deutsche Bank, HSBC and SocGen owned and were fixing members of the Gold Fix, were gold dealers, and are responsible for the alleged acts of their employees and the conduct and planning of the Gold Fix.

33.    **Agents and Unnamed Co-Conspirators**.  Various other persons, firms, corporations, or joint ventures not named Defendants in this lawsuit, the identities of which are presently unknown, may have participated as co-conspirators with each of the Defendants in their illegal activities alleged in this

Complaint and have performed acts and made statements in furtherance of the illegal combination and conspiracy.

## SUBSTANTIVE ALLEGATIONS

### A.    Overview of COMEX Gold Futures and Options Contracts

34.    Gold futures contracts and gold options contracts are traded on COMEX.

35.    COMEX, a Designated Contract Market of the Chicago Mercantile Exchange Group Inc., has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. COMEX submits to the CFTC various rules and regulations for approval through which COMEX designs, creates the terms of, and conducts trading in various precious metals futures and options contracts, including futures and options contracts for gold. COMEX is an organized, centralized market that provides a forum for trading gold futures and options contracts.

36.    COMEX provides standardized gold futures contracts with delivery dates commencing with the next calendar month and potentially extending as far as 72 sequential months into the future depending upon the month in which the contract was executed. Typically, there are approximately twenty COMEX futures

11

contracts trading at any given time.  Trading is conducted for delivery during the current calendar month; the next two calendar months; each February, April, August, and October falling within a 23-month period; and any June and December falling within a 72-month period beginning with the current month.  The "soonest" two expirations are referred to as the "front" months, and are the most actively traded months.

37.    A gold futures contract is an agreement to buy or sell a fixed amount of gold, typically 100 troy ounces (except for the so-called "mini" contract), at a date in the future.  The COMEX specifies the terms of trading, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

38.    Trades of gold futures contracts on the COMEX have two "sides." The "long" side represents the buyer of a contract who is obligated to pay for the gold and take delivery.  The "short" side represents the seller of a contract who is obligated to receive payment for the gold and make delivery.  If a market participant holds its position to the end of the settlement period for a gold futures contract, the market participant is obligated to "go to delivery."  That is to say, upon the settlement date, the "futures" contract for a particular month becomes a present contractual obligation for the purchase and sale of the physical gold.

Longs must take delivery and shorts must make delivery of 100 troy ounces per contract over the course of the contract month.  The price for the gold that goes to delivery is the "settlement price" of the COMEX gold futures contract.

39.     Only a small percentage of all futures contracts traded each year on COMEX and other exchanges result in actual delivery of the underlying commodities.  Instead, traders generally offset their futures positions before their contracts mature.  For example, a purchaser of a gold futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery of gold by selling an offsetting futures contract.  The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

**B.     COMEX Options**

40.     There are two types of options, calls and puts. A call gives the holder of the gold option the right, but not the obligation, to buy the underlying gold futures contract at a certain price, the strike price, up until some point in the future - options expiry.  Conversely, the put gives the holder the right, but not the obligation, to sell the underlying gold futures contract at the strike price up until options expiry.  Puts are usually bought when the expectation is for falling prices; a

13

call is usually purchased when the expectation is for rising prices. The price at which an option is bought or sold is the premium.

41.     There are various ways to use options to "go short," *i.e.*, profit from gold price decreases or "go long", *i.e.,* profit from gold price increases.  With regard to going short, for example, one can sell a futures contract, which confers upon the seller an obligation to deliver gold at a pre-specified date in the future at a pre-specified price.  One can also buy put options, which confers upon the buyer of the put option the right, but not the obligation, to sell gold to a buyer at a pre-specified strike price up until options expiry.   Alternatively, one can sell call options, which confers upon the buyer of the call option the right, but not the obligation, to buy gold from the seller at a pre-specified strike price up until options expiry.  The seller of the call option, in exchange for the option premium, commits to selling the futures contract at the strike price, at the buyer's election, until options expiry.

42.     In the cases above (or any other method in which an entity creates a short position), the entity that is short benefits as prices fall.  In the case of selling a futures contract, the seller at time of contract expiration simply offsets his position by purchasing a futures contract and pockets the difference in prices.  In the case of a call option, the seller benefits if the prevailing price is below the

14

strike price because it collects the option premium and pays nothing to the purchaser.

43.    At expiry, if the price of gold exceeds a call option's strike price, the rational holder will exercise the call option, which means the seller of the call option, if unhedged, will have to sell the futures contract at the strike price and cover their position, paying the difference between the prevailing price and the strike price.

**C.    Futures Prices Are Directly Related To The Gold Fix And Other Prices Of Physical Gold**

44.    The futures price is the market's consensus of the expected spot price for the underlying physical commodity at a specified future date.  Because the futures price is nothing more than an expectation of the future spot price, both futures and physical prices must be and are, in fact, correlated.  For example, if the futures price in a contract negotiated today for delivery next month starts to rise, this indicates that the market believes spot prices will rise next month.  The rise in the future price for next month delivery will cause a reaction today among producers and consumers of the commodity.

45.     Changes in futures prices for delivery months into the future have tangible effects on physical spot prices today.  Put statistically, futures prices and physical spot prices are linked and correlated.

**D.     Gold Fix**

46.     The origin of the Gold Fix dates to 1919 when the five leading gold dealers of the time would meet each morning to settle at a wholesale price for physical gold trades. Since then, the fixing process has changed slightly.  The five Defendants --- Barclays Bank PLC, Deutsche Bank AG, HSBC Bank PLC, HSBC Bank U.S.A., N.A., Bank of Nova Scotia ("Scotiabank"), Société Générale (sometimes referred to as "Fixing Members") --- have taken the place of the dealers.  Additionally, an afternoon fixing has been added to accommodate the US trade day, and the meetings are held via teleconference.

47.     The Gold Fix is supposed to be a process to fix a price for settling contracts between members of the London bullion market.  But the Gold Fix also provides a recognized price that is used as a benchmark for pricing the majority of gold products and derivatives throughout the world's markets. The Gold Fix is conducted in USD, Pound sterling (GBP), and the Euro (EUR) daily at 10.30am ("AM Fixing") and 3pm ("PM Fixing"), London time, via a dedicated telephone conference facility.

16

48.     The process that the Gold Fix was supposed to follow during the Class

Period has been stated to be  as follows:

a)  First, the lead participant begins the fixing by proposing a price

near the current spot price.

b)  Second, firms declare how many bars of gold they want to buy/sell

at the current market/spot price. This is based on current and

contemporaneous client orders (those entered during the call) as

well as proprietary needs of each member.

c)  Third, the price is then increased or decreased until the buy/sell

amounts are within 50 bars (the goal is to get buy order to equal

sell orders, but 50 is considered sufficiently close due to constantly

changing supply/demand).

d)  If for example 100 bars are on offer but only 25 bars are wanted

then the Chairman will progressively move the price downwards

and at each stage ask for expressions of buying and selling interest

and then for figures. Likewise if 100 bars are wanted and only 25

bars are on offer then the Chairman will progressively move the

price being tried upwards. This process continues until supply

meets demand or the imbalance is 50 bars or less and the Chairman

decides to declare a pro-rata Fixing and the price Fixed.

e) Finally, once the buy/sell orders are within 50 bars, that price point

becomes the fixing price.

f) In the event that it proves impossible to exactly meet supply and

demand or the difference is 50 bars or less then the Chairman may

declare the price Fixed and the Members will pro-rata the

difference between themselves. For example if there is more

buying than selling interest with two buyers and three sellers and

the difference is 25 bars both of the buyers will reduce their buying

interest by five bars and each of the sellers will increase their

selling interest by five bars each. This pro-rata arrangement is

purely between the Members and will not affect their underlying

customer orders.

*See* https://www.goldfixing.com/how-is-the-price-fixed/.

49.    This process supposedly takes between a few minutes and an hour.

There is no direct regulatory oversight of the fixing process.  The Fixing Members

and their company, Gold Fix, are responsible therefor.  *Id.*

**E.**     **Alleged Wrongdoing**

50.     **Unlawful conduct.** Plaintiff has good grounds to believe and does allege that at times between approximately January 1, 2004 and the present ("Class Period"), Defendants (as defined in ¶¶27-33 below) combined, conspired and agreed with one another and persons unknown to Plaintiff, in order to manipulate prices of gold and gold derivatives contracts.

51.     **Means and Purpose.** Defendants have effected their foregoing manipulation in order to profit themselves individually and collectively. This includes by abusing Defendants' ownership of, and positions as Fixing Members of, The London Gold Market Fixing Ltd. ("Gold Fix").

52.     As such members, Defendants reportedly engage in a process twice a day which results in the reported morning Gold Fix and the reported afternoon Gold Fix.

53.     The reports of the Gold Fix are the most important of the daily reports that influence the prices of gold. Gold derivatives, including the price of COMEX gold futures contracts traded in this District on the COMEX, a Designated Contract Market of the Chicago Mercantile Exchange Group Inc., are strongly influenced by the Gold Fix.

54.    Recent published and unpublished statistical studies, papers or analyses indicate that gold prices have been manipulated by and during and around the times of the Gold Fix.

55.    For example, one such analysis indicates that, since 2004, the time during the daily afternoon Gold Fix has exhibited a statistically significant pattern that includes the following.

56.    **First**, unusually large spikes in spot gold prices have consistently occurred during the afternoon Gold Fix.

57.    This statistical pattern was not observed prior to 2004, when Rothschild withdrew from the Gold Fix and Barclays took over as Chairman.  *See* ¶¶ 67-68, *infra*. Such pattern is not explained by news flow, fundamental analysis, or *a priori* explanations of how an efficient market operates.

58.    **Second**, there has been a propensity of the unusually large spikes during the afternoon in gold prices to exhibit a downward movement in gold prices.  During 2010, for example, when Plaintiff was long COMEX gold futures contracts, these aberrantly large movements were decreases in the price of gold 92% of the time such spikes were observed.

59.    This statistical pattern also is not explained by news flow, fundamental factors nor by *a priori* expectations of how an efficient market

operates.  On the contrary, such consistent large moves and statistical pattern are explained best by a collusive manipulation of prices in and around the times of the Gold Fix.

60.    Significant moves in gold prices registered around the time of the Gold Fix have also occurred on days of expiration of options on the COMEX gold futures contracts in this District.

61.    As reports of potential gold price manipulation have been surfacing, Defendants have changed their conduct in numerous ways.

62.    **First**, at least one Defendant has publicly announced that it will withdraw from the Gold Fix.  That Defendant is Defendant Deutsche Bank. Specifically, in mid-January 2014, Defendant Deutsche Bank said that it will withdraw from the gold panel, but that it will continue in its role until a buyer is found for the seat. *See, e.g.,*

http://online.wsj.com/news/articles/SB10001424052702304603704579326202725 433242?mg=reno64-wsj&url=http%3A%2F%2Fonline.wsj.com%2Farticle%2FSB10001424052702304 603704579326202725433242.html.

63.    When asked to comment on whether the bank's withdrawal from the panels was related to the recent regulatory scrutiny on the benchmark-setting

process, "Deutsche Bank declined to comment." *Id.*  The other four panel

members likewise declined to comment on Deutsche Bank's motive for

withdrawing.  None of them denied the existence of manipulation.  *Id.*

64.    **Second**, Defendants, who collectively comprise the London Gold Fix

panel, have begun investigating changes in the way the Gold Fix operates.  *See,*

*e.g.,* http://www.bloomberg.com/news/2014-01-21/century-old-london-gold-fix-

said-to-face-overhaul-amid-scrutiny.html. Defendants "have formed a steering

committee that's seeking external firms to advise how the process could be

improved . . . ." *Id.*

65.    **Third**, at least one or more Defendants has met with, responded to

inquiries from, and turned over documents to regulators in Germany and the

United Kingdom.   *See, e.g.,* http://www.ft.com/intl/cms/s/0/b386aa16-6358-11e3-

886f-00144feabdc0.html#axzz2ueeLXjkG.

66.    Reportedly, Germany's financial regulator, BaFin, "demanded

documents from Deutsche Bank as part of an investigation into potential

manipulation of gold and silver prices." *Id.* ("BaFin confirmed that it had been

looking into the possible manipulation of gold and silver prices . . . but declined to

comment on specific institutions").  The Financial Conduct Authority, a private

financial service regulator in the U.K., is also "scrutinizing how prices are set in

the $20 trillion gold market." *See, e.g.,* http://www.bloomberg.com/news/2013-11-26/gold-fix-drawing-scrutiny-amid-knowledge-tied-to-eruption.html.

67.    Defendants have been the subject of other charges or reports that they helped manipulate prices including of LIBOR as to all Defendants, and as to Euribor and TIBOR as to all Defendants but Defendant Nova Scotia.  In connection with LIBOR, various banks at first denied reports of manipulation.

68.    (a) There was at least some government supervision or regulation of Defendants in place with respect to LIBOR, TIBOR, and Euribor.  However, there was no government supervision and regulation in place for the Gold Fix.

(b) Thus, **fourth**, however, when given the opportunity to deny any wrongdoing here, Defendants have instead elected not to issue any comment.  *See, e.g.*, http://www.bloomberg.com/news/2014-01-21/century-old-london-gold-fix-said-to-face-overhaul-amid-scrutiny.html.

## EQUITABLE TOLLING

69.    Plaintiff disclaims any burden to plead facts regarding the statute of limitations.

70.    By its very nature, as alleged herein, the unlawful activity that Defendants engaged in was self-concealing.  Defendants failed to announce any

23

wrongdoing in the gold and gold derivatives (including COMEX gold futures contracts) market, through at least the time of the withdrawal from the Gold Fix of Defendant Deutsche Bank.

71.     Application of the doctrine of fraudulent concealment tolled the statute of limitations as to the claims asserted by Plaintiff and members of the Class.  Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until at least 2014.

72.     Plaintiff could not in the exercise of due diligence have discovered same.

## CLASS ALLEGATIONS

73.     Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and others similarly situated.  The "Class" is defined as:

> All persons or entities, other than Defendants and their employees, affiliates, parents, subsidiaries or co-conspirators (whether or not named in this Complaint), who, between January 1, 2004 and the present, held or transacted in physical gold, or gold derivatives (e.g. options) that settled or were marked-to-market based on

the Gold Fix, or held or transacted in COMEX gold
futures or options contracts.

74.     The Class is so numerous that joinder of all members is impracticable.

While the exact number of the Class members is unknown to Plaintiff at this time,

Plaintiff is informed and believes that at least hundreds of geographically dispersed

Class members traded COMEX gold futures and options contracts during the Class

Period.

75.     Plaintiff's claims are typical of the claims of the other members of the

Class.  Plaintiff and members of the Class sustained damages arising out of

Defendants' common course of conduct in violation of law as complained herein.

The injuries and damages of each member of the Class were directly caused by

Defendants' wrongful conduct in violation of law as alleged herein.

76.     Plaintiff will fairly and adequately protect the interests of the

members of the Class and have retained counsel competent and experienced in

class action litigation, including commodity manipulation and antitrust class action

litigation.

77.     Common questions of law and fact exist as to all members of the

Class which predominate over any questions affecting solely individual members

of the Class.  Among the questions of law and fact common to the Class are:

a)   whether Defendants' conspired among themselves and/or with others or acted individually to manipulate prices;

b)   whether Defendants' conduct manipulated prices;

c)   whether Defendants' conduct had an anticompetitive and manipulative effect on prices, and caused antitrust injury; and

d)   the appropriate measure of damages sustained by Plaintiff and other members of the Class as a result of Defendants' unlawful activities.

78.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

79.   The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives

would be unobjectionable. The amounts at stake for Class members, while

substantial in the aggregate, are not great enough individually to enable them to

maintain separate suits against Defendants. Plaintiff does not anticipate any

difficulty in the management of this action as a class action.


## CLAIMS FOR RELIEF

### AS AND FOR A FIRST CLAIM AGAINST ALL DEFENDANTS ON BEHALF OF ALL CLASS MEMBERS WHO PURCHASED, SOLD, OR HELD COMEX GOLD FUTURES OR OPTIONS
(Manipulation In Violation of The Commodity Exchange Act, 7 U.S.C. §§1 *et seq.*, including CFTC Rule 180.1(a))

80.     Plaintiff re-alleges and incorporates by reference the allegations of

this Complaint with the same force and effect as if fully restated herein.

81.     Defendants, through their acts alleged herein, specifically intended to

and did cause unlawful and artificial prices of gold or artificial price trends in gold

in violation the CEA, 7 U.S.C. §1, *et seq.*

82.     In violation of Commodity Futures Trading Commission ("CFTC")

Rule 180.1(a), Defendants also caused to be delivered for transmission false or

misleading or inaccurate reports of the Gold Fix, *i.e.*, false reports concerning

market information or conditions that affected or tended to affect the price of gold,

a commodity in interstate commerce. Defendants did so either knowingly,

27

intentionally or acting in reckless disregard of the fact that such reports were false, misleading or inaccurate.

83.   In all the circumstances previously alleged, each Defendant individually had and all Defendants collectively had the ability to cause and did cause artificial prices.

84.   Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts or omissions of their agents, employees or other persons acting on their behalf.

85.   As a direct result of the foregoing, Plaintiff and members of the Class transacted at artificial and unlawful prices, and transacted in an artificial and manipulated market, during the Class Period.  Defendants' conduct is presumed to have caused injury to the Plaintiff and the Class.

## AS AND FOR A SECOND CLAIM AGAINST
## ALL DEFENDANTS ON BEHALF OF ALL CLASS MEMBERS
**(Contract, Combination or Conspiracy In Restraint of Trade—*Per Se* And Other Violations of Section 1 of the Sherman Act, 15 U.S.C. §1 *et seq.*)**

86.   Plaintiff re-alleges and incorporates by reference the allegations of this Complaint with the same force and effect as if fully restated herein.

87.   Each Defendant is an independent entity and independent center of decision-making.  All Defendants own or operate and are responsible for the Gold

Fix.

88.     Defendants made, among themselves or with others, and/or Defendants constituted a combination, conspiracy or contract in unreasonable restraint of trade to manipulate gold prices for their profit in violation of Section 1 of the Sherman Act.

89.     As a direct result of the foregoing, Plaintiff and members of the Class transacted at artificial and unlawful prices, and transacted in an artificial and manipulated market, during the Class Period.  Defendants' conduct is presumed to have caused injury to the Plaintiff and the Class.

**AS AND FOR A THIRD CLAIM AGAINST ALL DEFENDANTS
ON BEHALF OF ALL CLASS MEMBERS
(Unjust Enrichment and Restitution)**

90.     Plaintiff re-alleges and incorporates by reference the allegations of this Complaint with the same force and effect as if fully restated herein.

91.     Defendants have benefited from their unlawful acts through, *inter alia*, creating increased revenues for themselves.

92.     It would be inequitable for Defendants to retain these benefits.

93.     Plaintiff and members of the Class are entitled to receive from Defendants an amount equal to Defendants' unjust enrichment.

## DEMAND FOR JURY TRIAL

94.     Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise,

Plaintiff respectfully demand a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as follows:

    A. That the Court determine this action may be maintained as a class
action;

    B. That the Court determine Defendants' actions alleged herein are in
violation of Section 9 of the CEA and CFTC Rule 180.1(a) and
that judgment be entered against Defendants for damages as
allowed by law;

    C. That the Court determine Defendants' actions herein are in
violation of Section 1 of the Sherman Act and that judgment be
entered against Defendants for treble damages as allowed by law;

    D. That the Court determine, find and declare that Defendants have
been unjustly enriched, impose a trust upon such unjust enrichment
for the benefit of Class members, and order Defendants to make
restitution to Plaintiff and the Class;

E.  That Plaintiff and the Class recover their costs, including

attorneys' fees;

F.  That injunctive relief be awarded to prevent future anticompetitive

and unlawful conduct;

G.  That prejudgment interest be awarded according to law; and

H.  For such other and further relief as this Court may deem just and

proper.

Dated:  New York, New York
        March 3, 2014

LOVELL STEWART HALEBIAN JACOBSON LLP

By: Christopher Lovell, Esq.
61 Broadway, Suite 501
New York, New York 10006
212-608-1900
*Counsel for Plaintiff*