UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE: GOLD FIXING ANTITRUST AND<br>COMMODITY EXCHANGE ACT LITIGATION | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Case No. 14-cv-01459-VEC

The Honorable Valerie Caproni

**MEMORANDUM ADDRESSING**
**THE NEED FOR SEPARATE CLASSES OR SUBCLASSES**

{00132324;1 }

## **TABLE OF CONTENTS**

Table of Authorities .................................................................................................................. ii

INTRODUCTION .......................................................................................................................1

BACKGROUND .........................................................................................................................1

      A.      The "Gold Market" ................................................................................................2

      B.      Defendants' Alleged Manipulation of the Gold "Fix" ............................................3

      C.      The OTC and Exchange-Based Markets are Interconnected .................................4

ARGUMENT ...............................................................................................................................6

I.     SEPARATE CLASSES OR SUBCLASSES ARE UNNECESSARY
BECAUSE ANY INTRACLASS CONFLICTS ARE PURELY HYPOTHETICAL
AT THIS TIME ................................................................................................................6

      A.      It is not Clear that Unique Defenses will Apply to Certain Claims ........................7

      B.      Hypothetical Conflicts Concerning the Allocation of Damages
do not Require the Appointment of Separate Counsel at the Pleading Stage .........8

CONCLUSION ..........................................................................................................................11

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Dairy Farmers of Am., Inc.*,
 279 F.R.D. 257 (D. Vt. 2011) ..........................................................................................8

*Amchem Prods. v. Windsor*,
 521 U.S. 591 (1997) ......................................................................................................6, 8

*Constance Sczesny Trust v. KPMG LLP*,
 223 F.R.D. 319 (S.D.N.Y. 2004) ....................................................................................10

*Dewey v. Volkswagen Aktiengesellschaft*,
 681 F.3d 170 (3d Cir. 2012) ............................................................................................6

*Finnan v. L.F. Rothschild & Co.*,
 726 F. Supp. 460 (S.D.N.Y. 1989) .................................................................................7

*Harris v. Koenig*,
 271 F.R.D. 383 (D.D.C. 2010) ........................................................................................7

*In re Amaranth Natural Gas Commodities Litig.*,
 269 F.R.D. 366 (S.D.N.Y. 2010) ....................................................................................10

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
 767 F. Supp. 2d 880 (N.D. Ill. 2011) ..............................................................................9

*In re Libor-Based Financial Instruments Antitrust Litig.*,
 2011 WL 5007957 (Oct. 18, 2011) .................................................................................8

*In re Literary Works in Elec. Databases Copyright Litig.*,
 654 F.3d 242 (2d Cir. 2011) ............................................................................................6

*In re NYSE Specialists Secs. Litig.*,
 260 F.R.D. 55 (S.D.N.Y. 2009) ......................................................................................10

*Johnson v. Meriter Health Servs. Employee Ret. Plan*,
 702 F.3d 364 (7th Cir. 2012) ..........................................................................................8

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
 571 F.3d 672 (7th Cir. 2009) ..........................................................................................6

*Morrison v. National Australian Bank Ltd.*,
 130 S. Ct. 2869 (2010) ....................................................................................................7

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999)......................................................................................................6, 8

*Robinson v. Metro-N. Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001)................................................................................................6

*S. Ferry LP No. 2 v. Killinger*,
    271 F.R.D. 653 (W.D. Wash. 2011) ...................................................................................7

*Valley Drug Co. v. Geneva Pharm., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ........................................................................................10

**Statutes**

Fed. R. Civ. P. 23(a)(4)..................................................................................................................6

**Other Sources**

A. Caminschi & R. Heaney, *Fixing a leaky fixing: Short-term market reactions to the London PM gold price fixing*, J. Futures Markets (2013)..................................................4

http://blogs.marketwatch.com/thetell/2014/04/29/deutsche-bank-resigns-seat-on-london-gold-and-silver-fix-reports/ ............................................................................................................3

http://www.cmegroup.com/clearing/trading-practices/efp-efr-eoo-trades.html .........................5

http://www.cmegroup.com/trading/metals/precious/gold_contract_specifications.html ...............9

http://www.cmegroup.com/wrappedpages/web_monthly_report/Web_ADV_Report_NYMEX_COMEX.pdf ........................................................................................................3

https://www.goldfixing.com/how-is-the-price-fixed/ ...................................................................3

https://www.goldfixing.com/what-is-gold-fixing/ ........................................................................4

http://www.lbma.org.uk/clearing-statistics....................................................................................2

http://www.lbma.org.uk/pricing-and-statistics .........................................................................2, 5

Jan Skoyles, *The London Gold Market: What's behind the smoke and mirrors?* (Jul. 11, 2013), http://therealasset.co.uk/london-gold-market-opaque/ ......................................................5

Jan Skoyles, *COMEX revealed: Investigating the paper gold market*, (Jun. 6, 2013),
http://therealasset.co.uk/comex-2-paper-gold/ .................................................................................5

Peter L. Smith, *Gold and Silver Clearing*, The Alchemist, No. 55, 5-6 (2009),
http://www.lbma.org.uk/assets/alc55_gold_clearing.pdf ...............................................................2

Samuel Issacharoff & Richard A. Nagareda, Class Settlements Under Attack,
156 U. Pa. L. Rev. 1649, 1678 (2008) .............................................................................................6

## INTRODUCTION

The Court's May 6, 2014 Order directs each firm seeking appointment as lead counsel to inform the Court whether "putative subclasses or other divisions are necessary or desirable given any actual or potential conflicts of interest." Dkt. No. 10 at ¶1. Cafferty Clobes Meriwether & Sprengel LLP ("Cafferty Clobes"), which represents Plaintiff Port 22, LLC ("Port 22"), respectfully submits that subclasses or separate classes appear unnecessary at this time. There seem to be no fundamental conflicts among class members at this time. Rather, the interests of class members who traded in exchange-based instruments and over-the-counter ("OTC") instruments appear to be aligned. These markets are interconnected. The physical gold that is the subject of the OTC transactions is the same commodity underlying the exchange-based instruments. All class members – regardless of instruments traded – share an interest in establishing that Defendants caused artificial prices. Although some counsel have hypothesized that there may be divergence in legal defenses applicable to particular instruments or conflicting desires as to how to divide up any eventual recovery, such hypothetical conflicts are not readily apparent in the record, and they do not warrant the creation of separate classes or subclasses at this time.

## BACKGROUND

Currently before this Court are twenty-three related class actions captioned *In re Gold Fixing Antitrust and Commodities Exchange Act Litigation* that are pending consolidation by the Judicial Panel on Multidistrict Litigation. Plaintiffs in these cases seek to represent persons and entities that transacted in gold-based financial instruments traded on US-based exchanges or in physical gold in the OTC markets.

A.      **The Gold Market**

The "gold market" consists of several different markets. The "physical" market refers to the around-the-clock trading of physical gold on OTC markets in London, New York, Tokyo and other cities. The majority of physical gold trading takes place and is settled in London through the London Bullion Market Association ("LBMA"), which represents global bullion dealers in the OTC markets. OTC transactions are performed between buyers and sellers outside public exchanges and, thus, are not reported to the public. The clearing members of the LBMA (including Defendants Barclays PLC, Deutsche Bank, AG, HSBC Holdings plc, and Bank of Nova Scotia) clear the majority of those trades between clients, such as central banks, mining companies and traders. According to the LBMA, during March 2014 (the most recent month for which data is available), its clearing members settled transfers of an average daily volume of 18.9 million troy ounces of gold worth approximately $25.3 billion.[1] Because these statistics are based only on transfers settled between the LBMA's six clearing members, analysts speculate that daily volumes may be understated by a factor of three to five.[2]

Investors also may transact in gold through exchange-based financial instruments. COMEX, a designated contract market of the Chicago Mercantile Exchange, is the US-based exchange through which investors may purchase gold-based futures and options contracts. COMEX provides standardized gold futures contracts with delivery dates extending as far as 72 months into the future, and there are approximately twenty COMEX futures contracts trading at

---

[1] *See* http://www.lbma.org.uk/clearing-statistics (last visited May 27, 2014).

[2] *See* Peter L. Smith, *Gold and Silver Clearing*, The Alchemist, No. 55, 5-6 (2009), http://www.lbma.org.uk/assets/alc55_gold_clearing.pdf (last visited May 27, 2014). *See also* Jan Skoyles, *The London Gold Market: What's behind the smoke and mirrors?* (Jul. 11, 2013), http://therealasset.co.uk/london-gold-market-opaque/ (last visited May 27, 2014).

any given time. The "nearest" two expirations are referred to as the "front" months, and are the most actively traded months. The commodity underlying each COMEX gold futures contract is 100 troy ounces of gold. COMEX also allows for trading in corresponding options contracts, each of which provides for delivery of a single gold futures contract. During March 2014, COMEX hosted an average daily trading volume of 20 million troy ounces of gold worth approximately $26 billion.[3]

### B.     Defendants' Alleged Manipulation of the Gold Fix

The London "Gold Fix" refers to the twice-daily process carried out by the members of the London Gold Market Fixing Ltd. ("LGMF"), Defendants Barclays PLC, Deutsche Bank, AG[4], HSBC Holdings plc, Bank of Nova Scotia and Societe Generale. LGMF Ltd., exists for the sole purpose of setting the Gold Fix twice-daily and publishing the resultant fixed price.[5] The "fix" refers to the process through which the Fixing Defendants "set" the price for one troy ounce of loco London gold (i.e., gold for physical delivery) through the LBMA.[6]

The setting process occurs in much the same way as it did when it began in 1919, albeit now by telephone rather than in-person. As explained by the LGMF website,[7] the Fixing Defendants convene a conference call twice-daily at 10:30 and 15:00 GMT. The Chairman, a

---

[3] *See* http://www.cmegroup.com/wrappedpages/web_monthly_report/Web_ADV_Report_NYMEX_COMEX.pdf (last visited May 27, 2014).

[4] Deutsche Bank withdrew from the fixing process effective May 13, 2014 and has not yet been replaced. *See* http://blogs.marketwatch.com/thetell/2014/04/29/deutsche-bank-resigns-seat-on-london-gold-and-silver-fix-reports/ (last visited on May 27, 2014). However, it was a member of LGMF, Ltd. at all times relevant to the instant actions.

[5] *See* https://www.goldfixing.com/how-is-the-price-fixed/ (last visited on May 27, 2014).

[6] *See Id.*

[7] *See Id.*

position that rotates annually, starts the process by announcing the then-prevailing spot price for loco London gold. The Defendants then announce their net buying or selling interest at the announced price based on all outstanding proprietary and customer orders. If Defendants are able to settle all trades at the announced price (i.e., no Defendant announces an interest) that price becomes "the Fix." If not, the Defendants announce their interests to the other participants and the process continues until the Fix is set.

### C. The OTC and Exchange-Based Markets are Interconnected.

Although the Fix is the benchmark price for physical gold traded OTC in London, "[t]he Gold Fixing also provides a published benchmark price that is widely used as a pricing medium by producers, consumers, investors and central banks."[8] In addition to impacting trading volumes, market dynamics and prevailing prices in the London OTC market, the Fix has a corresponding effect on exchange-based trading. The London 15:00 Fix (the "Afternoon Fix") has a statistically significant impact on both trade volume and price volatility in futures markets.[9] The Afternoon Fix materially impacts exchange-traded gold instruments because information from the fixing leaks into the markets prematurely, causing prices for derivative instruments to converge with that of physical gold.[10] Indeed, pricing is relatively consistent between the OTC and exchange traded markets. For example, on May 16, 2014 the London PM Fix was set at

---

[8] *See* https://www.goldfixing.com/what-is-gold-fixing/ (last visited on May 27, 2014).

[9] *See* A. Caminschi & R. Heaney, *Fixing a leaky fixing: Short-term market reactions to the London PM gold price fixing*, J. Futures Markets (2013).

[10] *See Id.*

{00132324;1}                                                4

$1291.50 per troy ounce, while June 2014 futures contracts traded on COMEX (the "front" month) closed at $1293.40, a difference of less than two dollars per ounce.[11]

Settlement procedures also are similar. Settlement refers to the transfer of physical gold or the cash equivalent between a buyer and seller. As this Court noted at the recent hearing, most futures contracts (about 98-99%) result in cash settlement rather than physical delivery.[12] These figures likely are somewhat overstated, however, because (as also was noted at the recent hearing) exchange participants sometimes engage in "exchanges for physicals," in which they divest themselves of a futures position in exchange for physical delivery of the underlying commodity.[13] Similarly, physical trades only rarely result in actual delivery. With the immense volume of gold being traded OTC, physical settlement is not practical, since daily average trading volumes dwarf the amount of physical gold actually available. One analyst has estimated that four hundred (400) times more gold is traded OTC in London each day than is actually produced.[14]

Accordingly, whether traded OTC or on a commodity exchange, the vast majority of all gold trades are settled in cash at correlated prices. Moreover, OTC and exchange-based market participants have been harmed by a common course of conduct orchestrated by the same Defendants, and which created artificial prices in these interconnected markets.

---

[11] *See* http://www.lbma.org.uk/pricing-and-statistics; ftp://ftp.cmegroup.com/settle/stlcomex.

[12] *See* Jan Skoyles, *COMEX revealed: Investigating the paper gold market*, (Jun. 6, 2013), located at http://therealasset.co.uk/comex-2-paper-gold/.

[13] *See* http://www.cmegroup.com/clearing/trading-practices/efp-efr-eoo-trades.html (last visited May 27, 2014).

[14] *See* Jan Skoyles, The London Gold Market: What's behind the smoke and mirrors? (Jul. 11, 2013), http://therealasset.co.uk/london-gold-market-opaque/ (last visited May 27, 2014).

{00132324;1}                              5

## ARGUMENT

I. **SEPARATE CLASSES OR SUBCLASSES ARE UNNECESSARY BECAUSE ANY INTRACLASS CONFLICTS ARE PURELY HYPOTHETICAL AT THIS TIME.**

Subclass divisions or separate classes are rooted in the requirement that "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997) (citations omitted). "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012). "'The hard question concerning intraclass conflicts asks which conflicts should matter ... what divisions should render the class representation so defective in structure as to rise to the level of a constitutional dereliction,' or violation of Rule 23(a)(4)." *Id.* (quoting Samuel Issacharoff & Richard A. Nagareda, Class Settlements Under Attack, 156 U. Pa. L. Rev. 1649, 1678 (2008)).

A "conflict must be fundamental to violate Rule 23(a)(4)." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011). "Where such a conflict does exist, it can be cured by dividing the class into separate homogeneous subclasses ... with separate representation to eliminate conflicting interests of counsel." *Id.* at 249-50 (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999)). But in order to be fundamental, a conflict must be *actual* and *apparent*, not merely hypothetical. *See Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 679-80 (7th Cir. 2009). *See also Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 171 (2d Cir. 2001).

At the May 5, 2014 hearing, several counsel encouraged the court to consider whether to divide the proposed class into two separate classes or subclasses: one including those that traded

gold OTC, and the other including those that traded gold-based instruments on US exchanges. Counsel asserted that two classes or subclasses were necessary for two reasons: (1) the two proposed subclasses likely would be subject to different defenses; and (2) the subclasses may come into conflict with one another when (and if) the parties engage in settlement discussions. Neither argument compels the use of separate classes, subclasses or the appointment of separate interim counsel at this stage of the litigation.

### A. It is not Clear that Unique Defenses will Apply to Certain Claims.

As a preliminary matter, Port 22 does not concede at this early stage that it (or any other representative plaintiff) will be required to demonstrate "direct" dealings with Defendants in order to seek relief under the antitrust laws. Nor is it clear that *Morrison v. National Australian Bank Ltd.*, 130 S. Ct. 2869 (2010), which addressed extraterritorial application of the Securities Exchange Act of 1934, applies here where manipulation of exchange traded instruments and their underlying physical commodity is involved. *Id.* at 2883 (holding that there is "no affirmative indication in the Exchange Act that section 10(b) applies extraterritorially").

In any event, the mere possibility that either of these defenses may affect certain claims reveals only a "speculative conflict[]" that this Court may address through the creation of subclasses "[i]f these differences *later* appear significant...." *S. Ferry LP No. 2 v. Killinger*, 271 F.R.D. 653, 661 (W.D. Wash. 2011) (emphasis added) (certifying a single class in securities fraud action while noting that sub-classing may be required to account for defenses applicable only to certain class members). *See also Harris v. Koenig*, 271 F.R.D. 383, 390-91 (D.D.C. 2010) (characterizing potential applicability of release obtained by defendant in related class action to claims of certain class members as a "speculative suggestion of potential conflict" that may be addressed at a later date by the creation of subclasses). In short, although "[t]hese issues

and defenses … may well call for the eventual creation of subclasses," they do not require the Court to do so at this early stage. *Finnan v. L.F. Rothschild & Co.*, 726 F. Supp. 460, 465 (S.D.N.Y. 1989) (certifying single class represented by ten named plaintiffs despite defendant's contention that each plaintiff group was subject to different dispositive defenses).

**B.     Hypothetical Conflicts Concerning the Allocation of Damages do not Require the Appointment of Separate Counsel at the Pleading Stage.**

Likewise, the potential need to allocate damages or settlement proceeds among Class members at some point *in the future* does not support the creation of subclasses *at this time*. "Conflicts of interest, as distinct from differences in entitlements, create an issue of adequacy of representation *by requiring the class representative to choose between competing class members*." *Johnson v. Meriter Health Servs. Employee Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012) (emphasis added). Accordingly, subclasses might be appropriate if it were clear that Class members transacting in exchange-traded instruments intended to pursue claims or seek relief at the expense of those that transacted in physical gold. *See Allen v. Dairy Farmers of Am., Inc.*, 279 F.R.D. 257, 274 (D. Vt. 2011) (denying class certification in antitrust action because desire of some class members to enjoin the activities of, as well as to seek damages from, cooperatives to which other class members belonged created a "fundamental conflict"). *See also Amchem Prods.*, 521 U.S. at 626 (in asbestos class action, finding conflict between "currently injured" class members whose "critical goal is generous immediate payments" and "exposure-only" class members whose goal was "an ample, inflation-protected fund for the future"); *Ortiz*, 527 U.S. at 856 (same). That is not the case here.

As this Court is well aware, in *In re Libor-Based Financial Instruments Antitrust Litigation*, No. 11-md-2262, 2011 WL 5007957 (Oct. 18, 2011), Judge Buchwald opted to create subclasses at the pleading stage. However, respectfully, the *Libor* court's approach is not

definitive. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 886 (N.D. Ill. 2011) (noting that proposed class in action involving both CEA and antitrust claims arising from defendants' alleged manipulation of physical and exchange-traded markets for dairy products included both traders and over-the-counter purchasers of physical products).

Moreover, *Libor* presented distinct circumstances. The OTC plaintiffs in *Libor* alleged that the defendants sold plaintiffs interest rate swaps tied to Libor, an interest rate benchmark, and then intentionally suppressed Libor in order to decrease variable interest rate payments owed to plaintiffs. *In re Libor*, 2011 WL 5007957, at *1. Conversely, other putative class members alleged that the defendants manipulated Libor in order to profit from trading Libor-based, exchange traded futures contracts. *Id.* Those class members would have likely been harmed by an upward manipulation of Libor that would have benefited the OTC plaintiffs. Such a conflict is not apparent in the present case. Moreover, the swaps in *Libor* were not the commodity underlying the futures contracts. Here, by contrast, the gold that is traded in the OTC markets is the commodity underlying the futures contracts, further demonstrating the class members' aligned interests and the interrelatedness of the instruments that they traded.[15]

Unlike in *Libor*, the OTC and exchange-based markets involved in this case are quite similar to one another. As discussed above, the physical and derivative markets appear interconnected given the impact of the Afternoon Fix on the futures market, their prices appear correlated, and trades are settled in similar fashion. Indeed, the physical gold traded in the OTC markets is the commodity underlying the COMEX futures contracts. In light of these similarities across the markets, it cannot be said at this time that the interests of some class members "are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other

---

[15] *See* http://www.cmegroup.com/trading/metals/precious/gold_contract_specifications.html (last visited May 27, 2014).

{00132324;1}    9

class members." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189-90 (11th Cir. 2003) (vacating certification of antitrust class because some class members were "harmed by the same conduct that benefitted other members of the class").

The only possible "conflicts" here are purely hypothetical – "the allocation of injury and damages, essentially boiling down to who suffered injury and how much." *In re NYSE Specialists Secs. Litig.*, 260 F.R.D. 55, 74 (S.D.N.Y. 2009). If the OTC market for gold is larger than the exchange-traded market, as some analysts have speculated, settlement proceeds may need to be allocated accordingly. But this does not mean that OTC market participants and COMEX market participants have conflicting views regarding their respective factual, economic, and legal theories. Indeed, their positions are likely to coincide given the interrelationship between the markets. Moreover, as courts in this District and others have noted, *hypothetical* disputes over damages do not compel the creation of subclasses at the class certification stage, let alone prior to the filing of a consolidated complaint. *See In re NYSE Specialists*, at 73-74 (quoting *Constance Sczesny Trust v. KPMG LLP*, 223 F.R.D. 319, 325 (S.D.N.Y. 2004) ("To the extent that different formulas may apply to the calculation of any damages suffered ... this Court can order certification of appropriate sub-classes at a later juncture within its broad discretion in arranging the structure of a class action litigation."). *See also In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 381 (S.D.N.Y. 2010) (same).

The Court should allow this action to proceed on behalf of a single class and select a firm or firms to serve as Interim Class counsel for the entire class. "If and when [conflicts] become real, the district court can certify subclasses with separate representation of each...." *Kohen*, 571 F.3d at 679-80 (affirming class certification in commodity manipulation action and despite claimed conflict as to potential allocation of damages). *Cf. In re Literary Works*, 654 F.3d at

250-55 (vacating certification of settlement class on grounds that conflict as to allocation of damages between class members required "homogeneous subclasses ... with separate representation" once it became apparent that conflict existed).

## CONCLUSION

At present, any claimed conflicts between representative plaintiffs and the groups they seek to represent are hypothetical. Dividing the classes now would not only be premature, but also would deprive the parties of the efficiencies that will result from Plaintiffs speaking with a single voice and the case proceeding on a single track. As many other courts have noted, in the event that an actual conflict arises, the Court can create subclasses or classes and appoint separate class counsel at that time. Accordingly, Cafferty Clobes and Plaintiff Port 22 respectfully request that the Court refrain from creating separate classes at this time.

Respectfully Submitted,

s/Jeremy A. Lieberman

Dated: May 27, 2014

_____

Patrick V. Dahlstrom
Jeremy A. Lieberman
Jayne A. Goldstein
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
pdahlstrom@pomlaw.com
jalieberman@pomlaw.com
jagoldstein@pomlaw.com

Bryan L. Clobes
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
1101 Market Street, Suite 2650
Philadelphia, Pennsylvania 19107
Telephone: (215) 864-2800
bclobes@caffertyclobes.com

{00132324;1}

Anthony F. Fata
Daniel O. Herrera
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
30 N. LaSalle, Suite 3200
Chicago, Illinois 60602
Telephone: (312) 782-4880
afata@caffertyclobes.com
dherrera@caffertyclobes.com

***Attorneys for Plaintiff Port 22, LLC***