UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN MAHER, on behalf of himself and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>BANK OF NOVA SCOTIA, BARCLAYS BANK PLC, DEUTSCHE BANK AG, HSBC HOLDINGS PLC, and SOCIÉTÉ GÉNÉRALE,<br>        Defendants. | Civil Action No. 14-cv-1459 |
| AIS CAPITAL MANAGEMENT, L.P., on behalf of itself and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>BANK OF NOVA SCOTIA, BARCLAYS BANK PLC, DEUTSCHE BANK AG, HSBC HOLDINGS PLC, and SOCIÉTÉ GÉNÉRALE,<br>        Defendants. | Civil Action No. 14-cv-1642 |

**OPENING MEMORANDUM OF LAW
<u>ON THE SUBJECT OF CLASS STRUCTURE</u>**

## TABLE OF CONTENTS

Page

BACKGROUND ..................................................................................................................1

I.      THIS CASE DOES NOT PRESENT FUNDAMENTAL CLASS CONFLICTS..............2

      A.      The Mere Existence of Different Plaintiff Groups Does Not Create
              a Fundamental Conflict.........................................................................................2

      B.      The Potential Class Conflicts Present in the LIBOR Litigation Are Not
              Present Here .........................................................................................................6

      C.      *Morrison v. National Australia Bank* Does Not Create a Fundamental
              Conflict ................................................................................................................9

      D.      Dividing the Class Based on the Existence of Possible Future Conflicts Is
              Unduly Speculative.............................................................................................10

II.     THE MAHER PLAINTIFFS' ORGANIZATION IS SUFFICIENTLY FLEXIBLE
      TO RESOLVE ISSUES OF SEPARATE REPRESENTATION.....................................11

CONCLUSION................................................................................................................11

## Table of Authorities

**Cases**

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997) ................................................................................................... 10

*Associated General Contractors of California, Inc. v.*
*California State Council of Carpenters*,
   459 U.S. 519 (1983) ...................................................................................................4

*Charron v. Wiener*,
   731 F.3d 241 (2d Cir. 2013)....................................................................................... 3

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
   253 F. Supp. 2d 262 (D. Conn. 2003)........................................................................ 5

*In re Copper Antitrust Litig.*,
   98 F. Supp. 2d 1039 (W.D. Wis. 2000) .................................................................... 7

*In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*,
   767 F. Supp. 2d 880 (N.D. Ill. 2011) ........................................................................ 4

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009)................................................................................... 4, 5

*In re Electronic Books Antitrust Litig.*,
   No. 11 MD 2293, 2014 WL 1282293, (S.D.N.Y. Mar. 28, 2014)........................... 10

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
   11 MD 2262 NRB, 2011 WL 5980198 (S.D.N.Y. Nov. 29, 2011) ................................. 2, 7, 8

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   11 MD 2262 NRB, 2011 WL 5007957 (S.D.N.Y. Oct. 18, 2011) ........................... 2

*In re Literary Works in Electronic Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011).................................................................................. 9, 11

*In re NYSE Specialist Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) .............................................................................. 10

*Loeb Indus. v. Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2001) ............................................................................. 3, 4, 5

*Minn-Chem, Inc. v. Agrium Inc.*,
   683 F.3d 845 (7th Cir. 2012) (*en banc*) ........................................................................ 9

*Morrison v. National Australia Bank*,
   561 U.S. 247 (2010) ........................................................................................................ 9

*Sanner v. Bd. of Trade of City of Chi.*,
   62 F.3d 918 (7th Cir. 1995) ...................................................................................... 4, 5

*Strobl v. N.Y. Mercantile Exch.*,
   768 F.2d 22 (2d Cir. 1985) ............................................................................................ 6

*Sykes v. Mel Harris and Assocs.*,
   285 F.R.D. 279 (S.D.N.Y. 2012 ..................................................................................10

## Statutes

7 U.S.C. §25 .......................................................................................................................... 3

## Other Authorities

http://www.bis.org/publ/otc_hy0811.pdf .............................................................................. 8

http://www.lbma.org.uk/assets/alc55_gold_clearing.pdf ................................................... 8

http://www.thecityuk.com/assets/Uploads/Bullion-Markets-2009.pdf ............................. 8

Plaintiffs Kevin Maher and AIS Capital Management, L.P. ("Maher Plaintiffs") respectfully submit this memorandum in response to the questions raised during the hearing on May 5, 2014, by counsel for Moran Plaintiffs concerning "potential conflicts" (May 5, 2014 Hearing Tr. at 12) that might be raised by defendants at some future date[1].  The Maher Plaintiffs respectfully submit that: (1) no conflict now exists requiring separate representation; (2) the division presented to the Court, by the Moran Plaintiff, would not resolve a potential future conflict should one arise; and (3) the organization presented by the Maher Plaintiffs is sufficiently flexible to permit separate representation, if it becomes appropriate.

## BACKGROUND

This case concerns allegations of manipulation of the London Gold Fixing, a twice-daily process by which a group of banks sets, by bid-and-ask process, a spot price for transactions in gold (the "Fix"). Plaintiffs allege that the manipulation caused to be artificial prices set during or based on or influenced by the Fix, including the prices of gold futures contracts traded in New York on the COMEX. Plaintiffs are persons who transacted in gold or gold derivatives during the period of the manipulation and allege injury caused by the manipulative and anticompetitive behavior.

During the Court's hearing on May 5, 2014, the Court addressed briefing schedules for applications by Plaintiffs to have their representative counsel be appointed interim class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure. During that discussion, counsel for the Moran Plaintiffs, stated: "the defendants can be expected to raise the question that the futures [*sic*] who traded on the exchange lack antitrust standing to bring the case" and that the

---

[1] This memorandum is filed on behalf of the plaintiffs in the following cases: *Maher v. Bank of Nova Scotia et al.,* 14-cv-1459; *White v.* Bank *of Nova Scotia et al.,* 14-cv-1643; *Denigris v. Bank of Nova Scotia et al.,* 14-cv-1638; *AIS Capital Management L.P. v. Bank of Nova Scotia et al.,* 14-cv-1642; *Nalven v. London Gold Market Fixing Ltd et al.,* 14-cv-1644; *White Oak Fund LP v. Barclays Bank PLC et al.,* 14-cv-1701; *Nicholson v. Bank of Nova Scotia et al.* 14-cv-1707; *Barker v. Bank of Nova Scotia et al.,* 14-cv-1964; *American Precious Metals Ltd. v. Bank of Nova Scotia et al.,* 14-cv-2102; *Teel v. Bank of Nova Scotia,* et al., 14-cv-2108; *Depaoli v. Bank of Nova Scotia et al.,* 14-cv-2124; *Lamborn v. Bank of Nova Scotia et al.,* 14-cv-2134; *Markun v. Bank of Nova Soctia et. al.,* 14-cv-2550; *Wolffe v. Bank of Nova Scotia et al.,* 14-cv-2807; *Diamond v. Bank of Nova Scotia et al.,* 14-cv-2851;. *Courtiol v. London Gold Market Fixing Ltd.et al.,* 14-cv-2948; *Gold Buyers. Inc. v. Bank of Nova Scotia et al.,* 14-cv-3006..

"over-the-counter class has *Morrison* extraterritorial problems." *See* Transcript at 12-13. Counsel for the Moran Plaintiffs believe this court should be guided by the arguments presented before the court's decision in *In re LIBOR-Based Financial Instruments Antitrust Litigation*, 11 MD 2262 NRB, 2011 WL 5980198 (S.D.N.Y. Nov. 29, 2011) ("*LIBOR*").

Although the Judicial Panel on Multidistrict Litigation will not hear applications on this case until July, counsel for the Moran Plaintiffs assert that the Court should address the proper definition of the class or classes on a preliminary basis because of these putative conflicts. For the reasons described below, the Maher Plaintiffs believe the existence of a putative conflict at this stage is speculative and that voluntarily denigrating the claim of one plaintiff or another is against the interests of all class members.

## I.   THIS CASE DOES NOT PRESENT FUNDAMENTAL CLASS CONFLICTS.

### A.   The Mere Existence of Different Plaintiff Groups Does Not Create a Fundamental Conflict.

Counsel for the Moran Plaintiffs identified a possible question of antitrust standing and characterized plaintiffs as consisting of either (1) COMEX traders or (2) physical gold purchasers. In support of this contention, counsel cited Judge Buchwald's decision in *LIBOR*[2], suggesting that COMEX traders face a standing issue while some over-the-counter purchasers are in privity with the defendants and do not (Tr. at 12).

The Maher Plaintiffs do not agree that the inclusion of physical purchasers and futures/options purchasers in one class, with the availability of subclasses, creates any fundamental conflict.

First,  the Moran Counsels' reasoning is flawed. Different plaintiffs of course present different facts.  But the distinctions between over-the-counter purchasers of physical gold and those who purchased gold derivatives are not clear-cut.  Nor do they give rise to conflicting positions or causes of action. Many, like Plaintiff Maher, purchased both physical gold **and**

---

[2] *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 11 MD 2262 NRB, 2011 WL 5007957, *2 (S.D.N.Y. Oct. 18, 2011).

futures contracts.  In addition, unlike in *LIBOR* (which is described in more detail below),  many who transacted in gold futures satisfied their contracts through making or taking delivery of physical gold or through exchanges of physical gold for futures contracts.  Further unlike *LIBOR,* many class members engaged in active arbitrage, trading between physical gold and gold futures that tightly chained the respective prices in each market to one another. In contrast, the defendants alone set the price of LIBOR and there was no arbitrage trading between LIBOR and the Eurodollar futures contracts that were at issue in that case.  *See* pp. 6-9 *infra* (developing many further distinctions between the facts here and those in *LIBOR*).

Second, as a matter of law, the mere recognition that different plaintiffs present somewhat different facts does not create a fundamental intra-class conflict. *See Charron v. Wiener*, 731 F.3d 241, 253-54 (2d Cir. 2013) (holding that exclusion of claims from settlement did not represent a fundamental conflict, stating: "All class settlements value some claims more highly than others, based on their perceived merits, and strike compromises based on probabilistic assessments. . . . If these types of compromises automatically created subclasses that required separate representation, the class action procedure would become even more cumbersome than it already is, and would create even more transaction costs in the form of legal fees."). Conflicts arise among plaintiffs when the elements of the claims plaintiff A (here, COMEX traders) must prove to succeed will injure the proof of one or more of the elements of plaintiff B's claims (here, perhaps physical gold purchasers, or other over-the-counter traders).

COMEX traders bring both antitrust and Commodity Exchange Act ("CEA") claims. As to the CEA claims, their standing is **not** in conflict with physical gold traders. This is because the CEA does not provide standing for claims by physical traders.  Section 22 of the CEA, 7 U.S.C. §25.

As to the antitrust claims, cases with similar fact patterns to that here, attest to the standing of *both* futures traders and physical traders; there is, thus, no need for one group prematurely to denigrate the standing of another.  *See, e.g.*, *Loeb Indus. v. Sumitomo Corp.*, 306

F.3d 469, 484-85 (7th Cir. 2001) (purchasers of copper cathode and purchasers of copper futures all have antitrust standing to sue for their respective injuries in different markets resulting from defendants' alleged manipulation of copper prices); *Sanner v. Bd. of Trade of City of Chi.*, 62 F.3d 918, 928 (7th Cir. 1995) (cash market sellers of soybeans possessed antitrust standing to challenge resolution requiring holders of long futures contracts to liquidate positions); *compare In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880 (N.D. Ill. 2011)(upholding antitrust claims of both milk futures contract traders and physical cheese purchasers who were all represented by the same class counsel).

Moreover, by establishing their own standing and the elements of their antitrust claims, futures traders and physical traders do not inherently defeat or even tend to undermine the standing or claims of the others. Antitrust standing traditionally rises and falls on whether a plaintiff is an "efficient enforcer" of the antitrust laws.[3] This in turn will rest on proving that the conduct affected, or "impacted," prices on the COMEX or in the physical market. The four "efficient enforcer" factors are: (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009). The factors are balanced to determine whether Plaintiff is an "efficient enforcer" of the alleged antitrust violation. *Id*. at 689.

Futures traders are efficient enforcers under *AGC* because they directly purchased and sold gold futures contracts on COMEX at prices that are linked to the prices of gold set by the

---

[3] To establish standing, an antitrust Plaintiff must show (1) an antitrust injury, and (2) that he is a proper Plaintiff in light of four "efficient enforcer" factors derived from the Supreme Court's decision in *Associated General Contractors of California, Inc. v. California State Council of Carpenters* ("AGC"), 459 U.S. 519 (1983); *see also, In re DDAVP*, 585 F.3d at 688 (citations and internal quotations omitted).

Defendants in the Fix.[4]  Again, courts have found direct antitrust injury in similar circumstances. *See, e.g., Loeb Indus.*, 306 F.3d at 484-85 (holding that plaintiffs who purchased copper futures and physical copper cathode at prices expressly indexed to the benchmark copper cathode futures market price manipulated by defendants had standing); *Sanner*, 62 F.3d at 927-30 (holding farmers who sold soybeans in the cash market had antitrust standing to seek damages caused by implementation of a trading rule for soybean futures contracts on a commodity exchange even though the farmers had not dealt with the commodity exchange or its members); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 273-74 (D. Conn. 2003) (denying motion to dismiss on *AGC* standing grounds where the plaintiff alleged the defendants had manipulated the benchmark butter futures contract price in order to increase above competitive levels the wholesale prices of milk, cream, and butter.)

The Maher Plaintiffs, as do all COMEX and non-COMEX traders, have the required motivation and self-interest to pursue their antitrust claims. *See In re DDAVP*, 585 F.3d at 688-89 (noting the second factor "simply looks for a class of persons naturally motivated to enforce the antitrust laws.") In addition, the Maher Plaintiffs' injuries are hardly speculative since every transaction during the class period was based on manipulated prices set by the Defendants in the Fix. Finally, damages can be calculated. COMEX traders would need to develop an economic model that would demonstrate a methodology to show that damages were suffered by the class members – *i.e.*, COMEX traders.

Similarly, many non-COMEX traders will have transacted at the actual Fix price, which is a physical gold spot price, and will derive their standing from having transacted at that manipulated price, without regard to whether the COMEX traders meet their burden. It is in no plaintiff's interest to argue to the contrary.  The law is clear that traders of contracts for the delivery of gold (or options on those contracts) on the COMEX directly have standing to enforce

---

[4] The Maher Plaintiffs have alleged they purchased and sold Comex gold futures and options, as well as physical gold, at artificial prices or in an artificial market. *See, e.g.,* Maher Complaint at ¶¶ 26, 44-48.

damage claims for manipulation of the underlying commodity under both the CEA and the antitrust statutes. *See, e.g.*, *Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 29 (2d Cir. 1985) (permitting CEA and Antitrust claims to be plead simultaneously). Neither group, by satisfying its burden, necessarily makes the other too remote from the anti-competitive conduct to enforce the law and recover. No conflict inherently arises; if one were to arise it would be fact-specific because of some part of the proof during discovery or at trial by one set of plaintiffs, and that specter cannot be accurately defined in advance.

      **B.**     **The Potential Class Conflicts Present in the *LIBOR* Litigation Are Not Present Here.**

     Although the Moran plaintiffs analogize this case to *LIBOR*, where the Court concluded separate classes were an appropriate mechanism for conducting the litigation, the Maher Plaintiffs believe the *LIBOR* case is readily distinguishable.

     The potential conflicts that were present in *LIBOR* do not represent concerns here. Unlike *LIBOR*, this is a case dealing with manipulation of futures contracts in physical (not financial) commodities. The financial instruments at issue here are required by law to be physically settled. While it is true that few contracts are held until the point of physical settlement, in a very real sense, a futures contract for gold is a possessory interest in 100 troy ounces of gold. Even if a buyer of a COMEX futures contract does not hold its contract until delivery, the buyer could engage in an exchange for physical (or EFP) transaction, whereby the buyer arranges for specific delivery of physical gold while simultaneously offsetting the contract by selling a contract to the supplier.

     For this reason, as numerous complaints in this matter have alleged, the markets for gold and COMEX gold futures essentially function as a single market, with prices of gold on the cash market set by reference to, or effectively determined by prevailing COMEX futures prices. *See, e.g.*, Compl., *Maher v. Bank of Nova Scotia et al*., 14-cv-1459, Dkt. No. 1 at ¶44 ("Because the futures price is nothing more than an expectation of the future spot price, both futures and physical prices must be and are, in fact, correlated."); *AIS Capital Mgmt., L.P. v. Bank of Nova*

*Scotia et al.*, 14-cv-1642, Dkt. No. 1 at ¶55 ("from January 2010 until December 2013, the London Fix and COMEX gold futures contract had a correlation coefficient of 99.99%, with average price spreads of only 0.15% and average return spreads of 0.22%"). In this context, courts have concluded that physical purchasers possess antitrust standing. *See In re Copper Antitrust Litig.*, 98 F. Supp. 2d 1039, 1051 (W.D. Wis. 2000) (rejecting argument that physical copper purchaser lacked antitrust standing, stating "[t]his overlooks the essence of plaintiff's claim: defendants had such power over the copper futures and cash markets that they could cause the exchange prices to rise."). Here, as in *Copper*, the complaints have alleged that futures and cash market prices "are directly related: when one goes up, so does the other." *See id.* at 1052. This direct relationship provides physical purchasers with antitrust standing. *Id.*

Because this is a case alleging both antitrust and commodities manipulation claims with respect to a physical commodity, the decision in *In re Copper Antitrust Litig.* is analogous . In that case, the court concluded that although the plaintiff did not acquire physical copper or copper futures contracts on the exchange, it possessed standing to litigate on behalf of the class. The Court noted that, in that case, the price for copper futures "varie[d] directly with the price for physical copper" and that "a manipulation of the price of copper futures . . . would correlate directly and predictably with changes in copper prices on the cash market." *Id* at 1043.

Because the *LIBOR* litigation involved financial commodities (not physical commodities), there was not a viable "single market" for both over-the-counter swaps and exchange-traded futures contracts. The over-the-counter contracts were relatively bespoke instruments that were individually negotiated pursuant to an ISDA agreement. The individual swaps were not the subject of public reporting and, accordingly, the information relating to the terms of those swaps could not have directed the prevailing futures price.

Furthermore, in *LIBOR*, the proposed combined exchange-traded/over-the-counter class represented substantially different market sizes. The Court in *LIBOR* analyzed submissions from applicants for lead counsel and was persuaded that the swap market was nearly 30 times as large as the market for exchange-traded instruments based on LIBOR. While noting that the case was

not governed by the Private Securities Litigation Reform Act of 1995, the Court stated that "we are not guided entirely by the magnitude of a plaintiff's economic interest, we nevertheless find this consideration highly relevant." *LIBOR*, 2011 WL 5980198 at *3.

There, the "majority plaintiffs" who sought lead plaintiff status had entered in exchange-traded contracts that represented an estimated 17% of the market for LIBOR-based instruments.[5] The rival lead plaintiff applicant was an over-the-counter swap purchaser and, as such, represented the vast majority of the market for LIBOR-based instruments. There was, for that reason, a risk that a combined class led by a group of exchange-traded plaintiffs would be disadvantaged, because those plaintiffs would have an interest in pursuing a smaller claim, even at the expense of the substantially larger over-the-counter claim. As such, the proposed combined class representing both OTC and exchange-traded purchasers ran a substantial risk that one claim would be considered substantially more valuable than the other or permit a plaintiff representing a small fraction of the market to control the litigation.

Here, the proposed class including both futures and physical purchasers does not pose a threat of a plaintiff representing a small minority of claims dominating the litigation.[6] Unlike *LIBOR*, there is substantial parity between the physical and futures markets, with an estimated daily $13.9 billion in over-the-counter physical gold trades cleared by the London Bullion Market Association in November 2008[7] and approximately $20 billion in February 2009.[8] Given that there are approximately 253 business days in the year, the physical trades cleared by the LBMA ($5.06 trillion)[9] almost perfectly matched the 2008 estimate of $5.1 trillion in gold

---

[5] *See* Bank of International Settlements, OTC derivatives market activity in the first half of 2008 (November 2008) at 6, available at http://www.bis.org/publ/otc_hy0811.pdf.

[6] Even in *LIBOR*, the Court acknowledged that the relative injury as between two parties was not dispositive as to the question of antitrust standing and which plaintiff should necessarily serve as lead plaintiff for the class. 2011 WL 5980198 at *3.

[7] http://www.thecityuk.com/assets/Uploads/Bullion-Markets-2009.pdf

[8] http://www.lbma.org.uk/assets/alc55_gold_clearing.pdf

[9] This figure is derived by multiplying the $20 billion average daily estimate by the number of business days.

futures and options contracts traded on exchanges.[10] This makes it substantially unlike *LIBOR* or *In re Literary Works in Electronic Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011) where the Second Circuit concluded that plaintiffs holding 99% of the claims were not adequately represented by a group of plaintiffs whose interest was dominated by substantially larger claims available to only a small subset of plaintiffs.

Moreover, over-the-counter physical gold transactions are unlike *LIBOR* because in that case the vast majority of OTC transactions were entered into with counterparties other than Defendants. Whereas the majority of interest rate swaps pegged to LIBOR were "direct purchaser" transactions where a plaintiff could directly transact with a named defendant, here, the vast majority of physical gold purchases affected by Defendants' alleged conduct would have been with non-parties whose prices were influenced by Defendants' alleged manipulation.

C.    *Morrison v. National Australia Bank* **Does Not Create a Fundamental Conflict.**

Counsel for the Moran Plaintiffs also suggested a putative conflict stemming from *Morrison v. National Australia Bank*, 561 U.S. 247 (2010) (Tr. at pp. 12-13), stating that *Morrison* would pose a hurdle for non-COMEX traders, while COMEX trades would have occurred solely within the United States, presenting no such issue. However, *Morrison* is not a decision defining constitutional jurisdiction; rather, the *Morrison* decision defined the statutory scope of the securities laws. The antitrust laws are a separate statutory regime, and the scope of their international impact is itself defined by statute in the Foreign Trade Antitrust Improvement Act. *See generally, Minn-Chem, Inc. v. Agrium Inc.*, 683 F.3d 845 (7th Cir. 2012) (*en banc*). The extraterritorial applicability of antitrust laws to the non-COMEX purchasers does not depend on proof affecting the COMEX purchasers' claims.

---

[10] http://www.thecityuk.com/assets/Uploads/Bullion-Markets-2009.pdf

**D.     Dividing the Class Based on the Existence of Possible Future Conflicts Is Unduly Speculative.**

Occasionally during or subsequent to the settlement process of a case, there are differences among plaintiffs regarding the allocation of a single settlement fund among the several claims that are being settled. However, at this early stage it is difficult to predict which parts of the class may present different facts than others, and impossible to determine whether any such differences rise to the level of a threat to adequacy. For a conflict to interfere with a finding that the representatives of a class are adequate, and trigger the problems discussed in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997), it must be "fundamental." *Sykes v. Mel Harris and Assocs.*, 285 F.R.D. 279 (S.D.N.Y. 2012). "Conflicts over the characterization of harm … at this early stage in the litigation need not defeat a motion for certification," *In re NYSE Specialist Litig.*, 260 F.R.D. 55, 74 (S.D.N.Y. 2009). *A fortiori*, here, where as Defendants point out (Tr. at 20) no consolidated complaint has been filed, unspecified assertions of harm by different class members are speculative. At such an stage, such "[s]peculative conflicts should be disregarded." *In re Electronic Books Antitrust Litig.*, No. 11 MD 2293, 2014 WL 1282293, at *12 (S.D.N.Y. Mar. 28, 2014) (granting certification).

The issue of later-arising conflicts is often dealt with by appointing counsel with clients having the separate interests to debate and recommend to the court an allocation among the claims, often with the assistance of an experienced mediator. It is often possible to structure separate representation for subclasses before a conflict becomes manifest, but its contours must be known. Where, as here, it is not yet clear along precisely what lines a division in the class would appear, such a division is both premature and unduly speculative. Splitting the class at this point runs a substantial risk of generating inefficiencies and multiplicity of counsel, without a clearly-defined benefit to the class.

## II.   THE MAHER PLAINTIFFS' ORGANIZATION IS SUFFICIENTLY FLEXIBLE TO RESOLVE ISSUES OF SEPARATE REPRESENTATION.

The Court ordered the first brief on "conflicts" prior to the subsequent question of Rule 23(g). We do not intend to argue the latter issue here. The question connected with the issue of supposed conflicts, however, warrants a short comment.

The plaintiffs in these cases consist of persons who purchased and sold physical gold; those who traded on the COMEX, some of whom had gold delivered pursuant to COMEX contracts; and plaintiffs who did two or more of the above. Counsel for the Moran Plaintiffs' suggestion that there is an irreconcilable division between these groups remains necessarily unclear at this early stage of the litigation.

If differences between plaintiffs give rise to a genuine conflict as the litigation goes forward, then such conflict as an issue of adequacy that can be addressed much more effectively at that time. Until such time, counsel representing the various constituencies can represent the group to which their own clients belong. The time to impose any structural divisions will be when the nature and dimensions of any such conflict become clear. *See In re Literary Works*, 654 F.3d at 252-53 (requiring subclasses with separate representation at the time of settlement).

## CONCLUSION

Without the presence of actual conflicts or other overriding issues that require class division prior even to the submission of a consolidating complaint following the ruling of the Judicial Panel, we respectfully submit that the Court should not split the prosecution of this case. Splitting the class at this preliminary stage before the case has progressed sufficiently to reveal whether any significant conflicts exist, is unwarranted and creates a risk of inefficiencies in the prosecution of the case. We respectfully urge the Court not to do so.

Respectfully submitted this 27th day of May, 2014


Dated: May 27, 2014
                                  Respectfully Submitted,

/s/ Christopher Lovell
Christopher Lovell
Fred T. Isquith Jr.
LOVELL STEWART HALEBIAN JACOBSON LLP
61 Broadway, Suite 501
New York, New York, 10006
Telephone: (212) 608-1900
Fax: (212) 719-4677
clovell@lshllp.com
fisquith@lshllp.com

/s/ Seth R. Gassman
Seth R. Gassman (SG-8116)
Michael D. Hausfeld (N.Y. Bar No. 4722963)
William P. Butterfield (*admitted pro hac vice*)
Timothy S. Kearns(*admitted pro hac vice*)
HAUSFELD LLP
1700 K Street, NW; Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
sgassman@hausfeldllp.com
mhausfeld@hausfeldllp.com
wbutterfield@hausfeldllp.com
tkearns@hausfeldllp.com

*Attorneys for Plaintiff AIS Capital Management, L.P.*